Filed 5/7/13  P. v Colver CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C068989 |
| Plaintiff and Respondent, | (Super. Ct. No. P09CRF0273) |
| v. | |
| STEVEN PAUL COLVER, | |
| Defendant and Appellant. | |

Police found Joanne Witt (Joanne) dead in her El Dorado Hills home with 20 knife wounds to her body.  Joanne's 14-year-old daughter, Tylar Witt (Tylar), and Tylar's 19-year-old boyfriend, defendant Steven Paul Colver, were charged with Joanne's murder.  Tylar pled guilty to second degree murder in exchange for her subsequent testimony at defendant's trial for first degree murder (premeditation and lying in wait) with two special circumstances (lying in wait and killing a witness to a crime, i.e, sex with a minor).  Following the murder trial, a jury found defendant guilty as charged.

On appeal from defendant's resulting sentence of life in prison without the possibility of parole, defendant raises seven contentions dealing with the evidence and instructions.  Finding no merit in these contentions, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

A

*The Prosecution's Case*

Defendant and Tylar were introduced by friends in December 2008 and started dating two months later. Thereafter, they began having sex regularly. Tylar lied to Joanne about their relationship, claiming it was like brother and sister. At Tylar's prodding, Joanne agreed to take defendant in as a boarder in spring 2009.

On May 14, 2009, upon seeing Tylar's bedroom door open, Joanne knocked on defendant's bedroom door. After a while, defendant appeared "half clothed." Tylar was in the closet, naked. Joanne told defendant to move out, and she told Tylar she would not press charges against defendant if he stayed away from Tylar. Defendant and Tylar thought that defendant could move out and Tylar could run away, and the two could eventually reunite. The next day, defendant moved out, telling Joanne, "'I'm lucky I'm not in jail right now.'"

On May 17, 2009, Joanne called the El Dorado Sheriff's Department to report Tylar missing. At the house, Joanne told a sheriff's deputy that her 14-year-old daughter was possibly having sex with her 19-year-old boyfriend. Tylar ended up calling the house when the deputy sheriff was there, and Tylar said she was at a friend's house. Sheriff's deputies picked up Tylar, who denied the sexual relationship, and they brought her home. The El Dorado Sheriff's Department opened an investigation into defendant's alleged unlawful sex with a minor.

On June 10, 2009, a deputy sheriff returned to the house and told Joanne that Tylar was still denying the sexual relationship. Joanne turned over Tylar's journal that detailed Tylar's sexual relationship with defendant. It was booked into evidence under a "statutory rape" investigation that had been opened.

On Thursday, June 11, 2009, Joanne told Tylar she had turned over the journal and a towel that was on defendant's bed. When Joanne left the house, a panicked Tylar called

2

defendant at Rubio's restaurant where he worked and told him what Joanne had done. They were certain he was going to be arrested. Defendant came to the house a short time later. They talked about what to do, recalling an earlier conversation they had had about committing suicide together, although defendant said that was a last resort. According to Tylar, they finally decided they would run away before Saturday (which is when they thought defendant would be arrested) and commit suicide together the following Monday in San Francisco. There was one "hitch," though. They would have to kill Joanne on Friday night because she would notice them missing. Tylar said they could not take a knife from the house, so defendant said he would get the knife. He had his own knives and blades and had access to knives at work as well.

When Joanne came home, she apologized to Tylar for invading her privacy. Tylar played video games until 10 p.m. or 10:30 p.m. when she went upstairs to go to bed. She noticed Joanne was asleep (for the time being), but the television was still on, meaning Joanne had been drinking. Tylar called defendant to vent about her mother being drunk again and suggested they kill her that night because it would be easier. They decided defendant would kill Joanne when Tylar was sure she was sound asleep. When defendant got off work, he parked his car in an elementary school parking lot next to the house. Defendant was at the parking lot from 10:59 p.m. to 11:56 p.m., which is when defendant received the last cell phone call from Tylar at that location. Tylar told him, " 'She's finally asleep. You can come over now.' "

Defendant walked to the house, so the gated community in which Joanne lived would not register his car's entry. Tylar met defendant outside the house, where he showed her a knife he had gotten from his work that was wrapped in a Rubio's plastic bag. They went inside, and Tylar grabbed a knife from the knife block in the kitchen. Tylar led defendant upstairs to Joanne's bedroom. Defendant went inside the room, and Tylar saw him "practicing" with the knife. She heard rustling, indicating Joanne had awakened. Tylar, with her knife in hand, turned to go into the room, but she "couldn't do

3

it." She heard Joanne telling defendant "to stop." Tylar put her knife on some cabinets right outside Joanne's door, sat against the door, covered her ears with her hands, closed her eyes, and hummed.

Defendant came out of the room holding a knife. He had blood on his pant leg and a teardrop of blood by his eye. Tylar went in Joanne's room, closed the windows and blinds, and turned on the air conditioner. Defendant and Tylar walked to his car and drove to his father's house, where defendant burned his clothes in the fireplace.

The next day, June 12, 2009, defendant and Tylar went to the house of their best friend, Matthew Widman. They told him they were running away to San Francisco to commit suicide. Later that evening, defendant told Widman he had stabbed Joanne in the stomach and slit her throat. When Widman said he wanted proof, defendant got out a bloody butcher knife from his car. After defendant and Tylar said goodbye to Widman, defendant threw the knife down an outdoor sewer drain. The knife was never found.

On the morning of June 13, 2009, Widman met up with a mutual friend of all of theirs, Matthew Bogert. Widman told Bogert defendant confessed to killing Joanne. Bogert called defendant on the phone, and defendant confessed again. Bogert recalled that defendant had sent him a text the afternoon before Joanne was murdered, blaming Joanne for "driving [him] into the ground." Defendant and Joanne had "made an agreement that if [he] would leave right then and there and remove [him]self from their lives, then she would not press charges or anything and let the encounter die." But then "[s]he started all of this hell because she got too fucking drunk one night and called the cops . . . [¶] Joanne was the one continuing to try to destroy [his] life, whether [he] w[as] to stay with Tylar or not."

The night of June 13, 2009, defendant and Tylar drove to San Francisco. Tylar wrote a story called, "'The Killer and [H]is Raven,'" and they both wrote goodbye letters to their friends, which they mailed. The raven story documented the love affair between a 14-year-old girl and a 19-year-old man, the latter who killed the girl's mother when the

4

mother turned over the girl's diary to police and shattered their dreams. In a letter defendant wrote to "whom it may concern," defendant stated the test of being " 'truly in love' " was "taking the life of another to be with the one you love."

On Sunday, June 14, 2009, around midnight, defendant and Tylar ate rat poison mixed with cake and milk, but the concoction did not kill them.

On June 15, 2009, Joanne was reported missing by her supervisor. Police went to Joanne's house and found her dead. There were defensive wounds on her hands and fingers. The fatal wound was a "very large gaping" sharp force injury to the neck. She also had stab wounds on the middle of her chest. From the stab wounds, the most the forensic pathologist could say was that the weapon was "likely a sharp-force object, a knife, and that . . . it [wa]s probably not a serrated knife." According to the crime scene investigator, some of the bloody impressions on the bed were consistent with a large kitchen knife, butcher's knife, or chef's knife. Fingernail scrapings from Joanne's right and left hands contained male DNA as did samples taken from Joanne's left knee. There was no female DNA foreign to Joanne found on samples taken from her body.

On Wednesday, June 17, 2009, defendant and Tylar were spotted by a South San Francisco police officer and were arrested.

B

*The Defense*

Defendant testified. On the afternoon before Joanne was murdered, defendant visited Tylar at her house. She suggested they commit suicide because police had her diary and could arrest and imprison him. They did not talk about killing Joanne. He returned to work at 3 p.m. and left at 10:15 p.m. All the work knives were accounted for. At 10:30 p.m., Tylar called him to come over to her house, upset that Joanne had broken her promise not to get drunk again. He decided not to rush over because the police had her diary that exposed the nature of their relationship. Instead, he drove to the school and waited for Tylar to call him telling him Joanne was really asleep. Around midnight,

5

Tylar called defendant in a frantic state and eventually told him to come over. Tylar met him outside with a kitchen knife in her hand and a red stain on her leg. She told defendant, " 'I did it. I finally did it. My mom is gone forever.' " Defendant went upstairs and nudged Joanne's leg to confirm she was dead. At Tylar's direction, they burned their clothes. Defendant confessed to killing Joanne because he made a promise to protect Tylar. Although they planned on killing themselves on a Monday, the day after the killing was Friday, and "[a] lot can happen in three days."

In addition to his own testimony, defendant provided the testimony of seven character witnesses who attested that he was not violent or aggressive. Included among those witnesses were Terrance Litton, who was the manager at Rubio's, and Dylan Heimbruch, an employee at Rubio's, both of whom did not notice any missing Rubio's knives around the time of the murder.

## DISCUSSION

### I

*Any Error In Excluding Testimony From The Defense's Expert Witness Regarding Defendant's Nonviolent Character Was Not Prejudicial*

The trial court granted the People's in limine motion to exclude the testimony of Dr. Bruce Ebert, who interviewed defendant and conducted a number of personality tests on him. Dr. Ebert concluded he "d[id] not believe [defendant] has the typical characteristics of an individual who would commit a homicide." The court ruled the testimony was inadmissible because it was propensity evidence.

On appeal, defendant relies on *People v. Guerra* (2006) 37 Cal.4th 1067, 1118-1119, to argue that propensity evidence such as Dr. Ebert's was admissible and its

exclusion here was prejudicial.  Following the analysis in *Guerra*, we conclude that any error in excluding Dr. Ebert's proposed testimony was nonprejudicial.[1]

In *Guerra*, the defendant sought to present expert testimony from one Dr. Jose La Calle "that [the] defendant was incapable of committing a violent act under normal circumstances.  Counsel offered  to prove that Dr. La Calle would testify that based on an interview of defendant and results from a series of tests given to him, he formed the opinion that [the] defendant has a passive personality, is nonviolent, and is incapable 'under normal circumstances' of committing a violent act resulting in a homicide." (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1118.)  "The trial court refused to hear Dr. La Calle's testimony and stated the evidence would be admissible only if he was '100 percent certain' that [the] defendant would not commit a violent act under *any* circumstances." (*Ibid*.)  The California Supreme Court disagreed.  It reasoned as follows: "[a] defendant may introduce opinion evidence of his or her character to show a nondisposition to commit an offense" and "conclude[d] that the trial court applied an incorrect standard by requiring Dr. La Calle to be '100 percent certain' that [the] defendant would not commit a violent act under any circumstances before the proffered testimony could be admitted.  Given an opportunity, the expert might have testified (or counsel might have expanded the offer of proof to state) that the facts of this case fell within his definition of normal circumstances.  Any error in excluding Dr. La Calle's proposed testimony, however, was nonprejudicial.  The evidence of guilt was strong, and the proposed testimony would have opened the door for rebuttal with the evidence of [the] defendant's prior assault . . . , which the prosecution introduced at the penalty phase." (*Id*. at pp. 1118-1119.)

---

[1]     Curiously, the People do not address *Guerra* in their brief.

Here, similar to *Guerra*, any error in excluding Dr. Ebert's proposed testimony was not prejudicial. Dr. Ebert's testimony would have added little, given that defendant had presented seven witnesses who had known defendant for years through work and/or school and had never seen him be violent or aggressive. These witnesses included the following four work colleagues: Terrance Litton, who was the manager at Rubio's, who had known defendant for two years; Dylan Heimbruch, who had known defendant for almost five years, both through school and work at Rubio's; Scott Spikes, who worked with defendant at Rubio's and had known him for two years; and Matthew Bogert, who had known defendant since their freshman year in high school and had worked with him. They also included the following three school classmates: Brent Harmon, who had known defendant for three years while taking college classes together and hanging out; Matthew Widman, who had been classmates with defendant since their sophomore year of high school and had also dated him; and Courtney Epperson, who had known defendant for six years through school.

Given this evidence, we also reject defendant's constitutional claims. (See *People v. Guerra*, 37 Cal.4th at p. 1119 [for the same reasons the court rejected the state law claims as being prejudicial, it rejected the federal claims as being prejudicial].)

II

*The Court Did Not Err In Admitting Evidence That Defendant Collected Knives*

Defendant contends the evidence that he collected knives was irrelevant because it: (1) violated California Supreme Court precedent (*People v. Riser* (1956) 47 Cal.2d 566); (2) violated the court's in limine ruling; and (3) constituted prosecutorial misconduct in the matter in which it was admitted and argued to the jury. As we explain the evidence was relevant to show that one of those knives could have been the murder weapon and to show defendant had access to a knife as the murder weapon. Its admission did not violate the in limine ruling, which excluded only the fact that the knife collection was found in the trunk of defendant's car. And as to the evidence that was

8

admitted as to the knives found in defendant's car and the prosecutor's closing arguments about the knives, defendant's contentions about those two things were forfeited by his failure to object.

## A

### *Background On The Knife Evidence*

Defense counsel moved in limine to exclude evidence that swords and knives were found in the trunk of defendant's car, arguing the evidence was irrelevant because Tylar's testimony was that defendant used a Rubio's knife to kill Joanne. The prosecutor argued the knife collection was relevant to show that a knife was defendant's weapon of choice, in this case where the identity of the killer was at issue. She noted that when Tylar was interviewed by police, Tylar stated she assumed the weapon would be a knife because "he always had knives on him." The court granted the defendant's motion to exclude evidence that defendant had swords and knives in his car's trunk without prejudice to have the issue reconsidered "[i]n the event that during the trial it becomes appropriate or apparent."

During trial, the prosecutor reraised the issue, noting defendant's motion went to only the knives found in defendant's car. The prosecutor argued, "we do not know the exact murder weapon, period." The court ruled that the prosecutor "absolutely" could ask Tylar about what she and defendant discussed about the murder, she could elicit evidence that he liked knives and had knives, but the evidence that they were found in the trunk was still inadmissible.

During the testimony of defendant's friend Matthew Bogert, the issue of defendant's knives arose again. The prosecutor asked Bogert to tell her about defendant's knife collection, but defense counsel objected. At a sidebar, the prosecutor argued the evidence of the knife collection (not what was found in defendant's trunk) was relevant because defense counsel "is making a big deal that it is not the Rubio's knife," and because defendant "had many other knives available to him," which was relevant to

9

show "motive and opportunity." The prosecutor further argued that "the fact somebody has a fetish with knives . . . shows that that would be the type of murder weapon that they would choose." The court ruled the evidence that defendant had a knife collection was admissible.

On cross-examination, defense counsel asked if Bogert was familiar with those knives, the prosecutor objected, and defense counsel admitted he himself had "opened the door." Bogert went on to testify there were no chef knives in defendant's collection. On redirect examination, Bogert testified the knives consisted of a "combination of long swords, short swords, small knives, pocket knives [*sic*], straight blades." He and defendant "actively went to the Renaissance Fair every year," they both had knife collections that they spent "a little bit of [their] paychecks" on, and "that" was something defendant enjoyed doing.

Thereafter, during Tylar's testimony, she testified on direct examination that defendant always had a switchblade on him and that he had a katana (a "Japanese short blade") that he usually kept in his room or in the truck of his car.

During defendant's testimony, the prosecutor asked defendant if he "liked knives" and he said, "I find them to be a hobby, yes." When asked how many he "carr[ied] at a time," defendant replied, "On my person or in my car?" When the prosecutor said, "Let's start with person," defendant replied a pocketknife. When the prosecutor asked "[h]ow many do you carry in your car," defendant replied he had a short-blade sword, a three-foot one in his trunk, and another pocketknife.

In closing, the prosecutor argued that the Rubio's knife "very well" could have been the knife that defendant used, but "[i]t doesn't have to be a Rubio's knife that he used." She continued that defendant had "a fetish with knives . . . he has a fascination with them. He always has different knives on him."

10

B

*Riser Actually Supports The Admissibility Of Defendant's Knife Collection*

In *Riser*, our Supreme Court held, "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon." (*People v. Riser*, *supra*, 47 Cal.2d at p. 577.) The court went on to admonish, "[w]hen the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Ibid.*)

Defendant's reliance on Riser as a basis for excluding the knife collection evidence is misplaced. *Riser* actually supports admission of the knife collection evidence here for at least two reasons.

One, a knife in defendant's collection could have been the weapon used to kill Joanne. The forensic pathologist testified the weapon used to kill Joanne was "likely a sharp-force object, a knife, and that . . . it [wa]s probably not a serrated knife." Defendant's knife collection contained "small knives" and "straight blades." As *Riser* notes, "[t]here need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon." (*People v. Riser*, *supra*, 47 Cal.2d at p. 577.) Thus, because there was at least some basis in fact for an argument to be made that the murder weapon could have come from defendant's collection, *Riser* did not prohibit evidence of the knife collection.

Two, defendant's knife collection was relevant to show he had access to knives and opportunity to kill using a knife, where the identity of the killer was the major issue disputed at trial. The defense spent a considerable time disputing evidence that a Rubio's knife was the weapon used to kill Joanne. This was significant because the implication

11

was that if it was not a Rubio's knife, it must not have been defendant who killed Joanne. The evidence that defendant collected knives was relevant to show he had access to and the opportunity to arm himself with a knife, apart from his work at Rubio's.[2]

C

*Defendant's Arguments That The Prosecutor Violated The In Limine Ruling And Committed Misconduct In Closing Argument Are Forfeited*

Defendant's other arguments are aimed at the prosecutor's alleged violation of the in limine ruling precluding evidence the knife collection was in defendant's car, which he claims was prosecutorial misconduct.[3] A review of the evidence regarding the weapons in defendant's car demonstrates the prosecutor did not violate the in limine ruling. Regarding the evidence that there were knives in defendant's car, the introduction of that evidence did not originate with the prosecutor. For example, during Tylar's testimony, the prosecutor asked, "did you ever see a katana on him?" Tylar responded, "He usually kept it in his room or in the trunk of his car." Thus, it was Tylar whose response implicated a knife in the trunk, not the prosecutor's question, which asked about weapons "on" defendant. Similarly, during defendant's testimony, the prosecutor asked defendant, "How many [knives] do you carry at a time?" Defendant responded, "On my person or

---

[2]     To the extent defendant also argues the court abused its discretion in admitting the knife evidence because its probative value was substantially outweighed by its prejudicial effect, this argument has no merit. The knife evidence did not portray defendant as someone who was "weird and abnormal," as defendant claims in his opening brief. Rather, the evidence showed he collected swords and knives because of his involvement in the renaissance faire, a hobby also shared by one of his friends. This evidence was not the type that would have evoked an emotional bias against defendant, outweighing its probative value.

[3]     Defendant claims that his motion was to exclude all knife and sword evidence. However, the motion he filed was to exclude the "swords and knives [that] were found in the trunk of [d]efendant's car."

12

in my car?"[4] Thus, it was defendant whose response implicated knives in the trunk, not the prosecutor's question. When Tylar's and defendant's responses insinuated that defendant had weapons in the trunk of his car, it was defendant's burden to object to introduction of that evidence and ask that it be stricken from the record. These responses changed the context in which the weapons evidence was being introduced, so as to constitute a basis for the court's reconsideration of exclusion of the evidence. (See *People v. Morris* (1991) 53 Cal.3d 152, 189.) Since he did not object, defendant forfeited any argument that this evidence violated the in limine ruling and prejudiced him.

Defendant also forfeited his claim that the manner in which the prosecutor argued the weapons evidence in closing argument was prosecutorial misconduct. Defense counsel did not object to the prosecutor's closing argument regarding the knife evidence. As such, defendant's claim of prosecutorial misconduct is forfeited. (*People v. Brown* (2003) 31 Cal.4th 518, 553.)

## III

### *The Court Did Not Abuse Its Discretion*
### *In Handling The People's Discovery Violation*

Defendant contends the court erred in refusing to exclude as a sanction for a discovery violation the evidence that male DNA had been found in Joanne's fingernail scrapings and then in refusing to instruct the jury on this discovery violation. As we explain, the court did not abuse its discretion in handling the discovery violation.

---

**4** The prosecutor responded by asking, "Let's start with the person" and defendant testified he carried one pocketknife. Then the prosecutor asked him "How many do you carry in your car" and defendant said he had a katana in his trunk at the time Joanne was murdered.

A

*Background On The Discovery Violation*

On March 18, 2010, Department of Justice criminalist Deanna Kacer stated in a report that was turned over to the defense that, " 'No DNA types foreign to Joanne Witt were detected on her fingernail clippings or her fingernail scrapings.' " On May 17, 2011, over one year later, trial began with opening statements. On May 25, 2011, Kacer informed the prosecutor that when reviewing her (Kacer's) notes in anticipation of her trial testimony, she noticed that the testing on Joanne's fingernail scrapings in 2010 showed the presence of male DNA. In 2010, Kacer did not conduct further testing on that DNA because she erroneously believed the case involved a female suspect, i.e., Tylar. On May 25, 2011, the prosecutor informed defense counsel that the 2010 test had revealed male DNA on Joanne's fingernail scrapings. On May 27, 2011, defense counsel filed a continuance motion to give him time to retain a DNA expert and to allow that expert time to prepare. On May 31, 2011, the trial court granted the defense a two-day continuance.

Thereafter, defense counsel filed a motion to exclude the testimony of any prosecution witness on the topic of the DNA found on Joanne's fingernail scrapings based on the discovery violation. At the hearing on defendant's motion, the court found a discovery violation, noting the following: the error lay with the prosecutor's "team," notably with Kacer, and although Kacer did not do it on purpose, there was "no justification" for the evidence being provided "three weeks-plus into this trial." The court asked defendant's DNA counsel whether he needed more time to evaluate the DNA evidence to present a proper defense.[5] DNA counsel said he would need six more months if there were going to be statistical evidence about the likelihood that the male

---

[5] The record is unclear whether defendant's DNA counsel was the same person as defendant's DNA expert.

14

DNA belonged to defendant. However, DNA counsel continued to request that the evidence of the male DNA in the fingernail scrapings be excluded. When the court pressed DNA counsel as to whether the exclusion was due to needing more time to evaluate the evidence, DNA counsel replied, "No." The court noted that the "way you cure matters that are late discovery is you get a continuance so that the [d]efense can do all of its proper investigation that it needs to, but you've told me that you've done that and you're ready to proceed on that issue . . . ." Thereafter, the court excluded any statistical evidence about the DNA belonging to defendant, but allowed in evidence that the fingernail scrapings contained male DNA.

At trial, Kacer testified that the fingernail scrapings from Joanne's right and left hands contained male DNA. The court refused DNA counsel's request to admit evidence as to the date that evidence was turned over to the defense. DNA counsel unsuccessfully argued he wanted that evidence in front of the jury because he wanted to ask for an instruction about late discovery. During the jury instruction conference, defense counsel requested CALCRIM No. 306 about untimely disclosure of evidence. The court refused the instruction, explaining the instruction was discretionary and the problem was "cured" by DNA counsel "saying he was prepared to go" and the court limiting the nature of that DNA testimony.

B

*The Court Did Not Abuse Its Discretion*

*In Handling The Discovery Violation*

Defendant contends the court erred in refusing to exclude as a sanction for the discovery violation the evidence that male DNA had been found in scrapings taken from Joanne's fingernails and in refusing to instruct the jury on this discovery violation.

Curiously, the People spend a considerable time arguing no discovery violation occurred, refusing to acknowledge the court's ruling that one did occur and ignoring defendant's citation to cases establishing that Kacer's failure to timely turn over evidence

15

about the male DNA was imputed to the prosecutor because Kacer was part of the prosecution team. (See, e.g., *People v. Little* (1997) 59 Cal.App.4th 426, 432; *People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1313.)

As we explain, the trial court acted within its discretion in fashioning an appropriate remedy for the discovery violation that addressed any prejudice that defendant faced as a result of the violation.

The prosecution must disclose certain categories of evidence in its possession or known to be in the possession of the investigating agencies. (Pen. Code,[6] § 1054.1.) Among the types of evidence that must be disclosed is "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged." (§ 1054.1, subd. (c).) "Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133.)

A trial court has wide discretion to address the People's failure to comply with their disclosure obligations. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) "Upon a showing that a party has not complied with Section 1054.1 . . . and upon a showing that the moving party complied with the informal discovery procedure . . . , a court may make any order necessary to enforce the provisions of this chapter, including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (§ 1054.5, subd. (b).)

In considering whether the trial court abused its discretion in selecting a sanction to address the People's discovery violation, we examine whether the trial court's

---

[6] All further section references are the Penal Code.

16

response "was inadequate to dispel any prejudice resulting from the prosecution's conduct." (*People v. Robbins* (1988) 45 Cal.3d 867, 884.)

Here, the response was adequate and therefore within the court's discretion. In response to the prosecutor's discovery violation, the court granted defense counsel a continuance and then excluded evidence that the male DNA found in the fingernail clippings possibly could have come from defendant. When the court asked DNA counsel whether he needed more time to evaluate the DNA evidence to present a proper defense, he responded he would need six more months *if* there were going to be statistical evidence about the likelihood that the male DNA belonged to defendant. He did not need more time to evaluate the evidence if the only thing that was going to come in was that it was male DNA. In fact, when the court pressed counsel as to whether he was asking for exclusion of evidence due to needing more time to evaluate the evidence, counsel replied, "No." On this record, the court was well within its discretion to allow in evidence the DNA was male but exclude evidence of the statistical probability it was defendant's DNA given the length of time defendant would need to prepare. For the same reasons, it was not an abuse of discretion for the court to decline to instruct the jury with CALCRIM No. 306.[7] (*People v. Lamb* (2006) 136 Cal.App.4th 575, 581 [the trial court's refusal to instruct the jury on late discovery is subject to review for abuse of discretion].) The court cured the prejudice of the late discovery by prohibiting the People from presenting

---

[7] CALCRIM No. 306 provides in part: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose: _____ <describe evidence that was not disclosed> [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure. [¶] [However, the fact that the defendant's attorney failed to disclose evidence [within the legal time period] is not evidence that the defendant committed a crime.]"

17

evidence that the male DNA could have come from defendant, which was the evidence defendant would have needed six more months to address.

IV

*There Was Substantial Evidence To Support*

*The Crime Witness-Killing Special Circumstance*

Defendant challenges the sufficiency of the evidence to support the jury's true finding on the crime witness-killing special circumstance. As we explain, there was sufficient evidence to support the jury's special circumstance finding.

The three elements of the crime witness-killing special circumstance are: (1) the victim witnessed a separate crime prior to being killed; (2) the defendant intended to kill the victim; and (3) the purpose of the killing was to prevent the victim from testifying about the crime witnessed. (*People v. Stanley* (1995) 10 Cal.4th 764, 801.) Defendant challenges the evidence to support elements one and three.

As to the first element, contrary to defendant's argument, the murder victim need not have been an eyewitness to the crime. (*People v. Clark* (2011) 52 Cal.4th 856, 952.) Here, Joanne was indeed a witness (albeit not an eyewitness) to a crime separate from her murder. Defendant had sex with Tylar when he was 19 and she was 14. Defendant's conduct constituted unlawful sex with a minor. (§ 261.5.) On May 14, 2009, Joanne found Tylar naked in defendant's room. Joanne also found Tylar's journal that detailed her sexual relationship with defendant. Joanne turned it over to police on June 11, 2009, and the police booked it into evidence under an investigation into "statutory rape" that the sheriff had opened.

As to the third element, defendant argues the purpose of killing Joanne was not to prevent her from testifying because he planned on killing himself, so there would be no criminal proceeding for unlawful sex with a minor against him. He notes (at least in his view) the prosecutor argued this in closing to the jury. Defendant's argument is misguided for at least two reasons. One, a part of the record defendant cites as support

18

for his position that the prosecutor argued defendant was serious about committing suicide and therefore he was not "too worried about going to prison or jail for unlawful sex with a minor" was actually part of defense counsel's closing argument. Two, if one of the motivations for the killing is to prevent the witness from testifying, the special circumstance may be found true even if there were additional reasons for the killing. (*People v. Stanley*, *supra*, 10 Cal.4th at pp. 799-801; *People v. San Nicolas* (2004) 34 Cal.4th 614, 656). Here, there was sufficient evidence that preventing Joanne from testifying was at least one reason defendant killed her. Defendant testified he knew it was "[m]ore than likely" if his sex with Tylar was reported to police, he could go to jail for what he believed could be up to 15 years. "Going to prison concerned [him] and scared [him]." It would also ruin his goal of being a math teacher. In a text message to a friend, defendant blamed Joanne for "driving [him] into the ground," noting that although he and Joanne had "made an agreement that if [he] would leave right then and there and remove [him]self from their lives, then she would not press charges or anything and let the encounter die," "[s]he started all of this hell because she got too fucking drunk one night and called the cops . . . . [¶] Joanne was the one continuing to try to destroy [his] life, whether [he] w[as] to stay with Tylar or not."

There was sufficient evidence of the crime witness-killing special circumstance.

V

*The Motive Instruction Did Not Eliminate An Element From the Crime Witness-Killing Special Circumstance And Did Not Lessen The People's Burden Of Proof*

Defendant contends the instruction on motive in CALCRIM No. 370 (stating the People were not required to prove defendant had a motive to commit the charged crime) reduced the People's burden of proof because it conflicted with the instruction on the crime witness-killing special circumstance (stating the jury had to find that defendant "intended that Joanne Witt be killed to prevent her from testifying in a criminal proceeding".)

19

To support this argument, defendant cites *People v. Maurer* (1995) 32 Cal.App.4th 1121. There, the defendant was charged with misdemeanor child annoyance, which required proof the defendant was " 'motivated by an unnatural or abnormal sexual interest . . . .' " (*Maurer*, at pp. 1125-1126.) The jury was also instructed that motive was not an element of the crimes charged. (*Id*. at p. 1126.) The appellate court held that the trial court erred by not excepting the misdemeanor child annoyance offenses from the motive instruction. (*Id*. at p. 1127.) The distinction between the words "motivation" and "motive" was of little practical significance and the two instructions presented the jury with "conflicting terms." (*Ibid.*)

The same is not true here. The jury instruction on the crime witness-killing special circumstance spoke in terms of "intent[]." However, "motive" and "intent" are not the same. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*Ibid*.) The California Supreme Court has explained that when the motive instruction is given, it does not relieve the People of its burden of proving the defendant's requisite intent. (*People v. Cash* (2002) 28 Cal.4th 703, 738-739.) In *Cash*, which involved a robbery-murder special circumstance, the defendant argued that the motive instruction relieved the People of their burden to prove he possessed the required intent to rob when he killed the victim. (*Cash*, at p. 738.) The California Supreme Court rejected the argument, explaining as follows: "The trial court instructed the jury that to find the existence of the robbery-murder special circumstance, it 'must find the murder was committed in order to carry out or to advance the commission of the crime of robbery,' and that 'the special circumstance is not present if the defendant's intent is to kill and the related felony of robbery is merely incidental to the murder.' In sum, the instructions as a whole did not use the terms 'motive' and 'intent' interchangeably, and therefore there is no reasonable likelihood the jury understood those terms to be synonymous. [Citation.]" (*Id*. at p. 739.)

20

The same is true here. None of the instructions equated motive with intent, and there is no basis for concluding the jury understood the terms "motive" and "intent" to be the same. Given our Supreme Court's analysis in *Cash* and the distinction between this case and *Maurer*, we reject defendant's argument.

VI

*There Was Sufficient Evidence Of*

*The Lying-In-Wait Special Circumstance*

The lying-in-wait special circumstance "requires 'proof of "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." ' [Citations.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 508.) Defendant contends the evidence of the special circumstance was insufficient for two reasons. One, the evidence was insufficient because it showed that Tylar (as opposed to defendant) lay in wait. And two, there was insufficient evidence corroborating Tylar's testimony concerning this special circumstance. As we explain, defendant's first argument rests on a faulty premise -- there is nothing requiring the killer himself lie in wait. And as to defendant's second argument, there was sufficient corroboration of accomplice Tylar's testimony.

21

## A

### *Defendant Provides No Applicable Authority That He Cannot Be Culpable For Tyler's Watching And Waiting*

For the proposition that defendant could not be culpable for Tylar's lying in wait, defendant relies on *People v. Bonilla* (2007) 41 Cal.4th 313.[8] We recount the facts and analysis in *Bonilla* and then explain why the case does not apply here.

In *Bonilla*, the defendant Bonilla hired two acquaintances to kill his business partner. (*People v. Bonilla*, *supra*, 41 Cal.4th at pp. 321-323.) Bonilla lured the victim to a deserted office park, purportedly to meet with a real estate agent. (*Id*. at p. 322.) The two killers were waiting there to ambush the victim. (*Ibid*.) One posed as a real estate agent and the other posed as a security guard. (*Ibid*.) When the victim arrived, the killers jumped him as planned. (*Ibid*.) Bonilla was convicted of first degree murder with a lying-in-wait special circumstance. (*Id*. at p. 320.) On appeal, Bonilla claimed the lying-in-wait special circumstance had to be reversed because "*he* did not engage in a substantial period of watchful waiting and that [the victim] was not killed during or immediately after any period in which *Bonilla* was concealing his purpose and watchfully waiting." (*Id*. at p. 331.) The Supreme Court rejected this argument: "[T]he issue is not whether Bonilla killed [the victim] while lying in wait; rather, the issue is whether Bonilla aided and abetted [the actual killer's] killing, and whether the actual killers killed [the victim] while (or immediately after) lying in wait." (*Ibid*.)

From this language in *Bonilla*, defendant argues the focus of inquiry is whether "the actual killer engaged in waiting and watching." *Bonilla*, however, is inapposite, because it did not address the situation we have here. In *Bonilla*, the issue was whether lying in wait by the killer accomplice could be imputed to the nonkiller defendant. Here,

---

[8]    Curiously, again, the People do not address *Bonilla* in their brief.

22

the issue was whether the lying in wait by the nonkiller accomplice (Tylar) could be imputed to the killer defendant. The jury instruction as to the special circumstance of lying in wait addressed that issue. Specifically, as to the special circumstance of lying in wait, the court instructed that "Tylar . . . was an accomplice to th[at] allegation[]." The court further instructed as to the elements of this special circumstance allegation: "He or she concealed his or her purpose from [Joanne]; [¶] Two, he or she waited and watched for an opportunity to act; [¶] Three, then he made a surprise attack on the person killed from a position of advantage; [¶] And, four, he intended to kill the person by taking the person by surprise."[9]

Thus, the instruction on the lying-in-wait special circumstance allowed for the possibility Tylar (as opposed to defendant) did the watching and waiting. Defendant provides no legal authority that a defendant cannot be culpable for an accomplice's watching and waiting. For this reason, we reject his argument that Tylar's watching and waiting could not be imputed to him.

---

[9]    Defendant quotes the wrong instruction when he argues that the jury was asked only to determine whether it was defendant himself who did the watching and waiting. As we have noted, the lying-in-wait special circumstance instruction allowed for either defendant or Tylar to have engaged in the watching and waiting.

The instruction defendant quotes is the instruction about lying in wait as a pathway to first degree murder (in addition to premeditation). The instruction on lying in wait as a pathway to first degree murder was as follows: "[t]he defendant murdered by lying in wait if: [¶] One, he concealed his purpose from [Joanne]; [¶] Two, he waited and watched for an opportunity to act; [¶] And, three, from a position of advantage, he intended to and did make a surprise attack on the person killed."

As defendant is challenging only the special circumstance of lying in wait (as opposed to the first degree murder conviction based on lying in wait), we have no occasion to address whether this instruction was correct in stating that defendant himself had to do the waiting and watching.

B

*There Was Sufficient Corroboration Of*

*The Lying-In-Wait Special Circumstance*

In his second argument why the lying-in-wait special circumstance cannot stand, defendant argues there was insufficient evidence corroborating Tylar's testimony concerning this special circumstance. He states, "[t]here was no corroboration, not even slight supporting evidence, to show that Tylar waited and watched for her mother to go to sleep before she was killed."

No so, because defendant's testimony and confessions furnished the slight corroboration necessary for the lying-in-wait special circumstance. (See *People v. Williams* (1951) 101 Cal.App.2d 624, 628 [sufficient corroboration may be furnished by defendant's own testimony or by his admissions or confessions]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1177-1178 [the corroboration "may be circumstantial, slight and entitled to little consideration when standing alone" and "need not be sufficient to establish the defendant's guilt or corroborate the accomplice to every fact to which the accomplice testified"].) Here, defendant testified he drove to the school and waited for Tylar to call him telling him Joanne was really asleep. After Joanne was stabbed to death, defendant confessed to friends Widman and Bogert that he was the one who did it. These confessions and defendant's testimony provided the slight corroboration needed to support Tyler's testimony regarding the lying-in-wait special circumstance.

VII

*The Accomplice Instructions Did*

*Not Lessen The People's Burden Of Proof*

CALCRIM No. 335 as given here instructed the jury that if murder was committed, Tylar was an accomplice and that accomplice testimony required "[s]upporting evidence" but that supporting evidence "may be slight." CALCRIM No. 708 stated the same for the two special circumstances.

24

Defendant contends the "slight" evidence language in CALCRIM Nos. 335 and 708 reduced the People's burden of proving the charged crime and special circumstances beyond a reasonable doubt by permitting the jury to find accomplice corroboration based upon slight evidence. As we explain, we disagree.

The statement that accomplice testimony need be corroborated by only slight evidence is a correct statement of the law. (§ 1111; *People v. Zapien* (1993) 4 Cal.4th 929, 982.) The corroboration requirement of section 1111 is a collateral factual issue, not an element of the charged offenses that must be proven beyond a reasonable doubt. (*People v. Frye* (1998) 18 Cal.4th 894, 967.)

The California Supreme Court in *People v. Richardson* (2008) 43 Cal.4th 959, reaffirmed the slight evidence standard. (*Id*. at p. 1024.) Neither *Richardson* nor any other California Supreme Court case holds that corroboration by slight evidence reduces the prosecution's burden of proof.

Defendant, however, contends that the United States Supreme Court decision in *Carmell v. Texas* (2000) 529 U.S. 513 [146 L.Ed.2d 577] stands for the proposition that a state's corroboration requirement of accomplice testimony is part of the quantum of evidence needed to convict and therefore must be proven beyond a reasonable doubt. Defendant misreads *Carmell*.

The defendant in *Carmell* committed rape at a time when Texas law required the testimony of a rape victim to be corroborated independently. (*Carmell v. Texas*, *supra*, 529 U.S. at p. 516 [146 L.Ed.2d at pp. 584-585].) At the time of trial, the law had changed to eliminate the corroboration requirement and the trial court applied the new law. (*Carmell*, at pp. 531-532 [146 L.Ed.2d at pp. 593-594].) The change in the Texas law constituted a change in the evidence needed to convict. (*Id*. at p. 522 [146 L.Ed.2d at p. 588].) Because the defendant would have been acquitted under the former law, the United States Supreme Court held application of the new law to the defendant violated

25

the ex post facto clause of the Constitution, but noted that nothing prohibited prospective application of the change in law.  (*Id*. at pp. 552-553 [146 L.Ed.2d at pp. 606-607].)

     *Carmell* did not hold that corroboration evidence tested by a standard lower than beyond a reasonable doubt was constitutionally invalid.  Thus, defendant's related contention that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435] requires proof beyond a reasonable doubt of corroboration evidence fails because it is based on his erroneous interpretation of *Carmell*.

DISPOSITION

    The judgment is affirmed.


                                                                                                                        ROBIE     , Acting P. J.


We concur:


      MURRAY    , J.


      DUARTE    , J.